UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM R. SHAW,

        Plaintiff,

        v.                                      Case No. 19-C-1059

CITY OF MILWAUKEE, CHIEF EDWARD FLYNN,
TERRENCE GORDON, PHIL HENSCHEL,
TIMOTHY A. HAUF, MICHAEL ANTONIAK,
KRISTOPHER MADUSCHA, THOMAS J. SLOWINSKI,
WHEATON FRANCISCAN HEALTHCARE,
DANIEL TESKA, EMPLOYER OF PHYSICAL ASSISTANT,
UNKNOWN RADIOLOGIST/X-RAY TECHNICIAN, and
UNKNOWN POLICE DEPARTMENT EMPLOYEES,

        Defendants.

## SCREENING ORDER

Plaintiff William R. Shaw, who is representing himself, filed a complaint under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights. The Prison Litigation Reform Act (PLRA) applies to this case because Shaw was incarcerated when he filed his complaint. The PLRA requires courts to screen complaints filed by prisoners to confirm that the complaint is not legally "frivolous or malicious" and that it states a claim upon which relief can be granted. 28 U.S.C. § 1915A(b). Additionally, he filed a motion to proceed without prepaying the filing fee and a motion to appoint counsel. This order screens the complaint and resolves Shaw's motions.

**MOTION TO PROCEED WITHOUT PREPAYING THE FILING FEE**

Shaw has requested leave to proceed without prepayment of the full filing fee (*in forma pauperis*). A prisoner plaintiff proceeding *in forma pauperis* is required to pay the full amount of

the $350.00 filing fee over time. *See* 28 U.S.C. § 1915(b)(1). Shaw filed a certified copy of his prison trust account statement for the six-month period immediately preceding the filing of his complaint, as required under 28 U.S.C. § 1915(a)(2). Magistrate Judge Nancy Joseph determined that pursuant to 28 U.S.C. § 1915(b)(4), Shaw was not required to pay an initial partial filing fee. Accordingly, Shaw's motion for leave to proceed without prepaying the filing fee will be granted, and he will have to pay the full filing fee over time as explained in this order.

## SCREENING OF THE COMPLAINT

Under the PLRA, a court must dismiss a complaint if a plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

To proceed under 42 U.S.C. § 1983, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the defendant was acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The court gives a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## ALLEGATIONS IN THE COMPLAINT

Shaw alleges that on February 27, 2014, at approximately 9:28 P.M., he was driving his father's car with his girlfriend, Heather Parker, and her friend, Shannon Hajek. He states that defendants Milwaukee Police Officers Antoniak and Maduscha stopped him on the 3100 Block of South 9th Place in Milwaukee, Wisconsin. Antoniak and Maduscha requested the names of the people in the car and then ordered Shaw to get out of the car. Shaw states he repeatedly asked them why he was stopped, but they refused to tell him. Antoniak then patted Shaw down, searching his pockets, his waistband, and the legs of his pants. Shaw states they did not find anything illegal on his person during that search.

Antoniak and Maduscha then arrested Shaw and placed him in the back of their squad car. Shaw states that they told him they were arresting him because Shaw's probation officer had previously placed a detainer on him. However, Shaw alleges that the officers did not contact the Department of Corrections until after his arrest and detainment, implying that they could not have known about the detainer at the moment of arrest.

After Shaw was arrested and placed in the squad car, Antoniak and Maduscha ordered Parker and Hajek out of the car and then searched the car. Parker was released on the scene, but Hajek was arrested. Shaw states that Hajek was arrested because she had a drug kit with 17 corner cuts of what appeared to be heroin in her purse. Shaw and Hajek were taken in separate squad cars to District 6 of the Milwaukee Police Department (MPD). Upon arrival, Shaw was searched again and placed into a holding cell.

Some point later in the night, an MPD Sergeant, name unknown, told Shaw that Hajek stated that Shaw "had drugs concealed inside of his rectum." Dkt. No. 1 at ¶ 31. Shaw states that Hajek had a lot to gain by providing information of this nature to MPD. Shaw also alleges that

3

police reports subsequently stated that Hajek told police that Shaw "only had placed drugs down his pants with his right hand." *Id.* at ¶ 32. Shaw vehemently denied that he had placed drugs inside himself and states that the Sergeant responded, "do you want to do this the easy way or the hard way." *Id.* at ¶ 33. When Shaw did not give the response the Sergeant wanted, the Sergeant allegedly pointed his finger in Shaw's face and told him that "he would be sorry for this." *Id.* at ¶ 34.

Antoniak and Maduscha then transported Shaw to the Milwaukee Police Administration Building. Upon arrival, Officer Slowinski searched Shaw and found nothing. Around 4:25 A.M. on February 28, 2014, Shaw was taken to Room 520 within the Administration Building. Officer Slowinski and Sergeant Hauf were in the room when Shaw arrived. Shaw was immediately ordered to remove his clothing and to give each article of clothing to Slowinski. Slowinski identified each piece of clothing by recording a description of it into a hand-held recording device. Hauf, meanwhile, observed. Once Shaw was naked, Slowinski ordered him to lift his scrotum and penis. Slowinski narrated his observations into the recording device. Slowinski then ordered Shaw to turn around, bend over, and spread his buttocks apart. Slowinski yelled at Shaw until Shaw adequately complied. Shaw alleges that while he was in this position, both Slowinski and Hauf conducted a detailed visual search of Shaw's exposed private areas. Shaw complained that holding this position was causing pain. Slowinski allegedly responded by yelling at Shaw to spread his buttocks apart further.

When the search was over, Shaw was ordered to put on his clothes. Shaw noted, as he was getting dressed, that there was a surveillance camera inside of Room 520. Shaw alleges that defendants Slowinski and Hauf deliberately positioned him so that his body was in full view of the camera during the strip-search. Shaw also states that Slowinski and Hauf did not obtain written

authorization to conduct and record the strip-search from their supervisor, Deputy Inspector Terrence Gordon, as required by Wisconsin law. Shaw alleges that the officers conducted and video-recorded the search without supervisor authorization "pursuant to official policy, custom, and usage," of the Milwaukee Police Department, Dkt. No. 1 at ¶ 56, and he alleges that the Milwaukee Police Department is an arm of the City of Milwaukee, which Shaw names as a defendant. *Id.* at ¶¶ 154–57. He also alleges that both Gordon and Chief Edward Flynn "had known or should have known about the officers engaging in improper searches, and facilitated, approved, condoned, turned a blind eye to, and/or purposely ignored the continued exploitation of arrestees being subjected to various degrees of nude searches" that were improper in part because they were recorded. *Id.* at ¶¶ 57–58. Specifically, Shaw alleges that both Gordon and Flynn knew that their employees were conducting and inappropriately recording invasive strip-searches without prior written authorization.

After the strip-search, Antoniak obtained a search warrant to search Shaw's body cavity. Shaw challenges Antoniak's affidavit used to obtain the search warrant, stating that it was fraudulent. He alleges that the affidavit stated he made a traffic violation when he didn't, and that it identifies him as "William L. Shaw" when his name is actually William R. Shaw. He also alleges that the affidavit was written in such a way to intentionally be misleading, stating that it strongly implies that the drug kit found in Hajek's purse was actually his. He further alleges that it improperly relies on Hajek's statements, and the officers knew or should have known that Hajek was not credible.

Shaw also alleges that Hajeck, a white woman, who actually had heroin in her possession at the time of the arrest, was released from custody; whereas Shaw, a black man, who did not have any illegal drugs in his possession, was detained and subjected to several humiliating and painful

5

searches. As such, Shaw alleges that he was subjected to "differential bias treatment" and was "exclusively targeted" because of his race. *Id.* at ¶ 65(F).

After Antoniak and Maduscha obtained the search warrant, Shaw was taken to Aurora Sinai Medical Center. There, medical personnel refused to conduct a body cavity search because Shaw would not consent. According to Shaw, hospital management determined that the search warrant was "not the correct paperwork necessary to do a rectal search against the patient's will." *Id.* at ¶ 85.

Antoniak and Maduscha then took Shaw to Wheaton Franciscan Healthcare-St. Francis. There, Physician Assistant Daniel Teska read the search warrant and asked Shaw to sign a consent form. When Shaw refused, Shaw alleges that Antoniak and Maduscha started yelling at him and threatening him. Then, Antoniak, Maduscha, and Teska put on gloves and proceeded to forcibly conduct a body cavity search. Shaw was handcuffed to a bed, and Teska pulled down Shaw's pants and underwear and inserted his fingers into his rectum. Shaw states he yelled out in pain while Antoniak and Maduscha laughed, drawing spectators.

When the search was unsuccessful, Teska suggested that Shaw's torso be x-rayed. An x-ray technician, name unknown, took the x-ray without providing Shaw protective gear. The x-ray showed that there was nothing in Shaw's body cavity. The results angered Antoniak and Maduscha. Shaw states that he was never charged or convicted of a drug-related crime as a result of the traffic stop but that he remained in custody for 120 days "for a sanction from his probation officer." *Id.* at ¶ 109.

Shaw further alleges that he filed a complaint with the Milwaukee Police Department Internal Affairs Division. He states that on September 30, 2015, Sergeant William C. Walsh conducted an investigation and was informed that Room 520 was no longer in existence. Shaw

alleges that Lt. Henschel stated that Room 520 used to be a part of the old Central Booking department prior to March 2014 and that at the time, it was used as an area to conduct strip searches. Internal Affairs responded to Shaw's complaint stating that no misconduct had been found. Shaw also filed a complaint against Teska with the Wisconsin Department of Safety and Professional Services, and in their response the department concluded that no misconduct had been found.

Shaw states that as a result of these illegal searches, he experienced physical pain, emotional distress, humiliation, and trauma. He requests compensatory damages, punitive damages, and fees.

### THE COURT'S ANALYSIS

Before turning to the substance of Shaw's claims, the court finds that Shaw cannot sue Wheaton Franciscan Healthcare, Daniel Teska, the Unknown Radiologist/X-ray Technician, and the Unknown Employer of Daniel Teska. Section 1983 allows a plaintiff to sue a "person" who, acting under the color of law, violates his constitutional rights. Wheaton Franciscan is a private corporation and is therefore not a "person" for § 1983 purposes. Although a plaintiff can sue a private corporation under § 1983 where a corporate "policy or custom gave rise to the harm (that is, caused it)," *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017), Shaw fails to allege that Wheaton Franciscan had a corporate policy or custom that gave rise to the alleged harm he suffered. Thus, Shaw cannot sue Wheaton Franciscan under § 1983.

Section 1983 also requires that individuals act under the color of state law. A defendant is acting under the color of state law where he or she exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). Shaw sues Teska,

Teska's employer, and the Radiologist, but he does not sufficiently allege that they were state actors. At most, Shaw alleges that they performed a transitory and isolated medical function that assisted Antoniak and Maduscha in executing a search warrant. This is not enough for liability to attach under § 1983. *See Moore v. Peterson*, No. 15-cv-936, 2016 WL 7017380, at *3 (E.D. Wis. Dec. 1, 2016) (finding that a hospital employee who executed a blood draw pursuant to a warrant was not a state actor under § 1983 because the service provided by the employee was transitory and isolated). As such, Shaw cannot sue Daniel Teska, Teska's Unknown Employer, and the Radiologist.

Shaw may proceed on several other claims, however. Regarding his arrest, Shaw states that defendants Antoniak and Maduscha had no reason to stop his car and no reason to arrest him. He alleges that they made up the reason for arresting him after the fact—that his probation officer had a detainer on him—because he states that they did not contact the Department of Corrections and find out about the detainer until after they arrested him. While probable cause is an absolute defense to a claim of wrongful arrest, Shaw alleges that Antoniak and Maduscha did not have probable cause. Probable cause to arrest exists where, "at the time of the arrest, the facts and circumstance within the officer's knowledge are sufficient to permit a prudent person to believe that the suspect had committed, is committing, or is about to commit an offense." *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014). Shaw sufficiently alleges that Antoniak and Maduscha did not believe at the time of his arrest that he had committed, was committing, or was about to commit an offense, so he may proceed on a Fourth Amendment unlawful arrest claim against Antoniak and Maduscha.

Turning to the strip search of Shaw conducted in Room 520 at the Milwaukee Police Administration Building, the Fourth Amendment guarantees a right to be free of unlawful

8

searches and seizures. For a strip search, officials "must have reasonable suspicion that a detainee is concealing contraband before they may conduct a strip search." *United States v. Freeman*, 691 F.3d 893, 901 (7th Cir. 2012). Even if the officials have reasonable suspicion, the search must be conducted in a reasonable manner. *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007).

Shaw has sufficiently raised the questions of whether Slowinski and Hauf had reasonable suspicion and whether they conducted the strip search in a reasonable manner. Because a strip search "involving the visual inspection of the anal area are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signify degradation and submission,'" courts have found that the more intrusive the search, "the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." *Id.* at 716 (quoting *Mary Beth G. v. City of Chicago*, 723 F.3d 1263, 1273 (7th Cir. 1983)). Shaw contends that he was told a strip search was necessary because, during questioning, Hajek told police that Shaw had drugs concealed in his rectum. Shaw alleges that Hajek was not a credible source of information that police could reasonably rely on because he notes that the police report allegedly states that Hajek reported that he only placed drugs down his pants. Shaw also notes that Hajek had a lot to gain by providing this information to the police and that he was already searched as an incident to his arrest several times and nothing illicit was found. And, he alleges that the search was invasive; the search was recorded both by the hand-held recorder and a surveillance camera. He was made to bend over and spread his buttocks, while being yelled at that he wasn't showing enough. Thus, at this stage of the case, he adequately alleges that the strip search was unreasonable and may proceed on a Fourth Amendment claim against Slowinski and Hauf.

Shaw also brings claims against Deputy Inspector Terrence Gordon and Police Chief Edward Flynn under the theory of supervisor liability. Supervisors can be held liable for constitutional violations caused by their employees where the violation happens at the supervisor's direction or with the supervisor's knowledge and consent. *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* Shaw alleges that Milwaukee Police Officers had a custom or practice to conduct and record strip-searches without prior written authorization from their supervisors, which he alleges violated his Fourth Amendment rights. Shaw also states that Slowinski and Hauf acted pursuant to this practice, and that Gordon and Flynn knew about this practice. At this stage in the case, Shaw's allegations are sufficient, and he may proceed on a claim against Gordon and Flynn under a theory of supervisor liability.

Shaw also lists Lieutenant Phil Henschel as a defendant and alleges that he gave Sergeant Walsh, the officer investigating the strip-search for MPD Internal Affairs, information about Room 520. This allegation is not enough to connect Henschel to the strip-search or hold him liable under a theory of supervisory liability. As such, Shaw fails to state a claim against Henschel, and he is dismissed.

Shaw may also proceed on a claim against the City of Milwaukee for the custom and practice of conducting and recording invasive strip-searches without written authorization, in violation of Shaw's constitutional rights. In order for a municipality to be liable for a plaintiff's constitutional violation, the plaintiff must allege that the violation was a result of a municipal policy or custom. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). This includes

"governmental customs" that result in constitutional violations even though the "custom has not received formal approval through the body's official decision-making channels." *Id.*

Additionally, Shaw brings a claim against Antoniak for making fraudulent statements in the affidavit used to obtain a warrant to conduct a body cavity search. Affidavits supporting search warrants are presumptively valid. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). For a plaintiff to overcome this presumption, he must show "that the officers 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests.'" *Id.* (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir. 2003)). A plaintiff can demonstrate that an officer had a reckless disregard for the truth where he can show "that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp*, 320 F.3d at 743.

Shaw fails to allege that Antoniak made the affidavit with a reckless disregard for the truth. He points to the use of the wrong middle initial, the mention of a traffic violation, and the vague description of the location of the heroin as evidence of the affidavit's fraudulent nature. However, at most, these are simply sloppy errors in drafting the affidavit, and there is no indication that the errors impacted the judicial determination that probable cause exists. As such, Shaw may not proceed on a Fourth Amendment claim against Antoniak for the validity of the affidavit used to secure the search warrant.

Turning to the body cavity search that took place at the hospital and pursuant to a warrant, Shaw brings Fourth Amendment claims against Antoniak and Maduscha for an unreasonable

search of his person. As mentioned above, even where a search is permissible, it still must be reasonable to pass constitutional muster. *See Campbell*, 499 F.3d at 718. To determine whether a body cavity search is reasonable, courts should consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 716 (internal citations omitted). Shaw alleges that the manner in which the officers conducted the body cavity search was unreasonable and that the search itself was aggressive and caused unnecessary pain. He also alleges that the search created a spectacle that drew on-lookers. After the search failed to reveal anything, Antoniak and Maduscha subjected him to an x-ray under unsafe conditions. Thus, Shaw may proceed on his Fourth Amendment claim against Antoniak and Maduscha for the body cavity search.

Shaw also attempts to bring claims of unconstitutional discrimination under the Equal Protection clause, conspiracy, and failure to intervene. To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). A plaintiff must "provide the 'grounds' of his 'entitlement to relief,'" which requires "more than labels and conclusions," and a plaintiff also can't simply provide "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Here, Shaw fails to identify any actors—even using John Doe placeholders[1]—who allegedly discriminated against him, engaged in a conspiracy against him, or failed to intervene as his constitutional rights

---

[1] Shaw does mention an unnamed Sergeant but does not connect any of these allegations to him. He also names "Unknown Milwaukee Police Department Employees and Officers" as defendants, but the body of the complaint lacks any ties of these unknown officers to his allegations.

12

were being infringed upon. All he provides are labels, conclusions, and a formulaic recitation of some of the elements of the cause of action. Accordingly, he may not proceed on these claims, and the "Unknown Milwaukee Police Department Employees and Officers" are dismissed as defendants.

Finally, Shaw sues all defendants in their official capacities. Official capacity claims against municipal employees are essentially *Monell* claims. Since Shaw will be granted leave to proceed against the City on his *Monell* claim, there is no need to add official capacity claims against the individual defendants. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978). Accordingly, his official capacity claims against the individual municipal employees will be dismissed.

Shaw did file a motion to supplement his complaint and clarify his request to sue the defendants in their official capacity (Dkt. No. 8). The motion fails to follow the rules of civil procedure, but even if it did, the motion does not indicate any reason why the official capacity claims should proceed against the individual employees in light of the fact that the City remains a defendant in the case.

**MOTION TO RECRUIT COUNSEL**

Shaw also requested that the court recruit him counsel in this matter. Dkt. No. 7. Civil litigants do not have a constitutional or statutory right to appointed counsel. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007) (en banc); *Zarnes v. Rhodes*, 64 F.3d 285, 228 (7th Cir. 1995). Yet, district courts have the discretion to recruit counsel for individuals unable to afford counsel. *Navejar v. Iyola*, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many

13

indigent litigants and too few lawyers willing and able to volunteer for these cases.'" *Henderson v. Ghosh*, 755 F.3d 559, 564 (7th Cir. 2014) (quoting *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Pennewell v. Parish et al.*, 923 F.3d 486, 490 (7th Cir. 2019) (quoting *Pruitt*, 503 F.3d at 653). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. *Pickett v. Chicago Transit Authority*, 930 F.3d 869, 871 (7th Cir. 2019). In this case, Shaw satisfied the first prong. He contacted no less than nine attorneys and outlined the reasons for why they declined to take the case. Dkt. No. 7 at 1–2.

When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." *Pennewell*, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." *Id.* This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." *Id.* at 490–91. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." *Id.* at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." *Pickett*, 930 F.3d at 871.

Shaw has failed to demonstrate a need for court-recruited counsel under the second prong. Shaw states that he requires an attorney because he has no experience filing § 1983 civil complaints and has received assistance from other pretrial detainees. He also notes that he has a G.E.D. and that the case is relatively complex with many defendants. Despite these arguments, the court finds Shaw is competent to proceed *pro se* in this case.

It is not enough to say that a lawyer might do a better job handling the lawsuit, since that would almost always seem to be the case. Instead, the question is whether the plaintiff would be unable to coherently present the case to a judge or jury. In this case, Shaw's communications with the court to date have been exceptional. His complaint is well-written and well-thought-out. Although Shaw may have received some guidance, it is fairly common that *pro se* litigants get help on their cases from more knowledgeable inmates. Using such help is not reason enough to recruit counsel. In short, there is nothing in the record to suggest that Shaw does not have the same competence to represent himself as the vast number of other *pro se* litigants who cannot afford to hire an attorney and are unable to convince one to take his case on a contingent fee basis.

As such, the court believes at this time that Shaw is capable of handling the initial stages of litigation on his own. Accordingly, his motion for recruitment of counsel will be denied. At the same time, the court will direct that a copy of this order be sent to attorneys who have handled similar cases in this court in the past and invite them to consider whether they wish to represent Shaw. In the event they do not, the court will give further consideration to Shaw's request as the case proceeds.

**IT IS THEREFORE ORDERED** that Shaw's motion for leave to proceed without prepayment of the filing fee (Dkt. No. 2) is **GRANTED**.

**IT IS FURTHER ORDERED** that Shaw's Motion to Recruit Counsel (Dkt. No. 7) is **DENIED without prejudice**.

**IT IS FURTHER ORDERED** that Shaw's Motion to Supplement the Complaint (Dkt. No. 8) is **DENIED**.

**IT IS FURTHER ORDERED** that Phil Henschel, Wheaton Franciscan Healthcare, Daniel Teska, Unknown Employer of Physical Assistant Daniel Teska, Unknown Radiologist or X-Ray Technician, and Unknown Milwaukee Police Department Employees and Officers are **DISMISSED** from this case.

**IT IS FURTHER ORDERED** that the U.S. Marshals Service shall serve a copy of the complaint (Dkt No.1) and this order upon defendants **City of Milwaukee, Chief Edward Flynn, Terrence Gordon, Timothy A. Hauf, Michael Antoniak, Kristopher Maduscha, and Thomas J. Slowinski** pursuant to Federal Rule of Civil Procedure 4. Shaw is advised that Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. § 1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for these fees to be waived either by the court or by the U.S. Marshals Service. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§ 0.114(a)(2), (a)(3). The U.S. Marshals Service will give Shaw information on how to remit payment. The court is not involved in collection of the fee.

**IT IS FURTHER ORDERED** that defendants **City of Milwaukee, Chief Edward Flynn, Terrence Gordon, Timothy A. Hauf, Michael Antoniak, Kristopher Maduscha, and Thomas J. Slowinski** shall file a responsive pleading to the complaint.

**IT IS FURTHER ORDERED** that copies of the complaint and this order be sent to the Office of the Milwaukee City Attorney.

**IT IS FURTHER ORDERED** that the agency having custody of Shaw shall collect from his institution trust account the full $350.00 filing fee by collecting monthly payments from Shaw's prison trust account in an amount equal to 20% of the preceding month's income credited to Shaw's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this case. If Shaw is transferred to another county, state, or federal institution, the transferring institution shall forward a copy of this order along with his remaining balance to the receiving institution.

**IT IS FURTHER ORDERED** that a copy of this order be sent to the officer in charge of the agency where plaintiff is confined. A copy should also be sent to Dennis Brand at the Milwaukee County Jail.

**IT IS FURTHER ORDERED** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

**IT IS FURTHER ORDERED** that plaintiffs who are inmates at Prisoner E-Filing Program institutions[2] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

---

[2] The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the matter.

Plaintiff is further advised that failure to make a timely submission may result in the dismissal of this case for failure to diligently pursue it. In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Green Bay, Wisconsin this 24th day of September, 2019.

s/ William C. Griesbach<br>
William C. Griesbach, Chief Judge<br>
United States District Court